NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 815-2922
Telefax:    (609) 376-3018
taxcourttrenton2@judiciary.state.nj.us

April 12, 2018

John M. Caruso, Esq.
238 Neptune Boulevard, Suite 301
Neptune, New Jersey 07753

Dennis A. Collins, Esq.
Collins, Vella & Casello. L.L.C.
2317 Highway 34, Suite 1A
Manasquan, New Jersey 08736

Re:    MCE Upper Freehold, L.L.C. v. Township of Upper Freehold
       Docket No. 008487-2016

Dear Counsel:

This is the court's decision after a trial on the issue raised in the above captioned complaint,

namely, that the imposition of interest and penalty by defendant ("Township") of $30,701.02 for

an alleged late payment of rollback, and fourth quarter 2015 taxes, was improper and inequitable.[1]

For the reasons stated below, the court finds that plaintiff credibly established a presumption of

receipt of the regular mailing of the checks, and therefore, vacates the interest and penalty.

**FACTS**

On June 10, 2015, plaintiff, through Mr. Glackin, the financial controller of plaintiff's

management company, CJS Investments, Inc., notified the Township's assessor that plaintiff was

purchasing property located at 1335 Old York Road, and identified as Block 12, Lot 7.  The

---

[1] The matter had been subject of the parties' respective motions for summary judgment.  By letter opinion dated March 16, 2018, the court denied the same on grounds that it required a hearing on a factually disputed issue.

*

property, which in total measures about 280 acres, was owned by another New Jersey entity, and was being assessed as qualified farmland (thus, on the tax lists included a designation as "Q Farm."). Plaintiff purchased a portion of the same (about 80 acres), for development for non-farmland qualified purposes. Mr. Glackin requested the assessor to issue a "Memorandum of Rollback Tax Estimate," based on a June/July 2015 closing, so that the estimated taxes could be escrowed and "used to pay the final rollback tax assessment." He noted that per their conversation, the "final bill" for 2015 would be sent "to the property owner of record."

The assessor responded the same day stating that the estimated taxes would "not exceed $380,000" based on a sale price of $5 million for the $\pm$ "84.7" acres comprising 49 lots.

Plaintiff purchased the Subject for $5,550,000 on June 23, 2015, at which time, it had been approved for development. The sale deed reflected plaintiff as the buyer/owner, its mailing address, the Subject's former identification (Block 12, Lot 7 QFARM), and current identification (differently numbered lots and blocks on the Township's new tax map). The Township's assessor received a copy of the recorded deed sometime in July of 2015.

On August 4, 2015, Mr. Glackin e-mailed the assessor notifying her that plaintiff had purchased "Block 12 Lot 7" and asked whether the 2015-16 property tax bills were "sent out," and if they were sent to the prior owner's address, to send a copy to him. He also asked that a copy of the rollback tax bill should be sent to him "as well."

The assessor responded by an e-mail on the same day that the third quarter tax bills had already been sent out and had "been paid." The fourth quarter tax bill was $561.73 and payable November 1, 2015. She noted that the 2015 tax billing did "not reflect the new lots for the upcoming development," rather showed the bill "for the property as a whole." She also stated that "[t]he new lots will not be reflected until January 1, 2016" and "[t]ax bills on the new lots" would

2

not be mailed or payable "until summer 2016." She indicated that she had "spoken" to the tax collector in this regard, and would "be sure to address" the rollback information to Mr. Glackin. The Township's tax collector acknowledged that she and the assessor had discussed plaintiff's ownership of the Subject, and its request for a corresponding name and address change on the Township's tax records.

Two weeks thereafter, the assessor sent plaintiff a rollback assessment complaint (tax years 2013-3015) with the proposed stipulation of settlement by certified mail addressed, to Mr. Glackin. The stipulation indicated the total estimated taxes as $371,102.78. The tax collector was also made aware that plaintiff would be obligated to pay the rollback taxes.

The parties then finalized the rollback assessment, with a "projected" tax of $323,520.71. On September 4, 2015, Mr. Glackin e-mailed the executed stipulation to the assessor, and noted that upon receipt of a bill from the Township, he would "immediately submit payment." He asked the Township to "direct all future correspondences and notices to [plaintiff] only at [the] e-mail address or physical address" provided below his e-mail, and that the prior owner's information be "remove[d] from the email and physical mailing address list." The assessor responded "will do."

However, there was no change to the tax records by either the assessor or the tax collector. When a portion of property is sold, the assessor cannot create new lots (thus, new line items) mid-year, and can do so only on January 1 of the following year. Thus, an ownership change cannot be made electronically mid-year, although an address change can. Until then, the prior owner would continue to be reflected as the owner of record for the entire lot, thus, would continue to get the tax bills in this regard. The assessor's e-mail to Mr. Glackin did not explicate that tax bills would be sent to the prior owner regardless of his requests that he receive the tax bills and notices, nor could she recollect explaining this eventuality Mr. Glackin. The tax collector however, could,

3

print and mail duplicates of the tax bill/s sent to the prior owner, but only if the current owner requested the same. The assessor conceded that rollback taxes are not the same as the regular quarterly-installment tax, nonetheless, because of the inability to electronically create new lots mid-year, she stated that the rollback tax bill would also be mailed only to the prior owner. The tax collector (during deposition) stated that it is not an automatic assumption that the new owner is responsible for payment of the rollback tax and was an issue "between the buyer and seller."[2] Nonetheless, both officials agreed that they could manually note in their records that there was an ownership change, and the assessor did so in this regard, yet sent the tax bills to the prior owner.

On September 9, 2015, the County Board issued a judgement (which was mailed September 10, 2015), for rollback assessment. The judgment reflected the total rollback taxes as $323,520.71. It also noted as follows:

> It is further ORDERED that a copy of this Judgment be sent to the Assessor and Collector of the Taxing Municipality and the Owner of the Property.
>
> ROLL-BACK TAXES ARE PAYABLE TO THE TAXING MUNICIPALITY UPON RECEIPT OF A BILL FROM THE COLLECTOR OF THAT MUNICIPALITY.

Sometime on October 21, 2015, Mr. Glackin posted the rollback tax amount as an account payable on his electronic accounting books (using Quickbooks software), since he was aware the same was due soon thereafter.[3] However, he was awaiting a formal tax bill to ensure that the amount therein was the same as negotiated in the settlement. Not having received any, and being concerned that the October advance of the construction loan from the bank, which were advanced

---

[2] The parties jointly provided as evidence, transcripts of depositions of Mr. Glackin, the tax assessor and the tax collector, and the Township's responses to plaintiff's interrogatories and request for admissions.

[3] The internal recordkeeping showed that the fourth quarter tax was created as an account payable on October 30, 2015, however, per Mr. Glackin this was for "backup" purposes, and the check was mailed October 29, 2015.

as monthly draws, and payable to plaintiff around the end of October, would be jeopardized if taxes were not current, he reached out to the assessor by e-mail of October 29, 2015.[4] He noted that he had never received "a final tax bill for the Roll-Backs or the Quarterly payments," and asked if the assessor "[w]ould . . . be able to forward [him] a copy."

The assessor and the tax collector responded (on the same day) that the bills were likely sent to the prior owner, and that a "duplicate" would be mailed and e-mailed to plaintiff.[5] The tax collector then e-mailed and sent by regular mail, a copy of the tax bills to Mr. Glackin.

Mr. Glackin stated that he then mailed check #1059 dated October 29, 2015, for the rollback tax ($323,520.71), and check #1060 for the fourth quarter 2015 tax ($561.73). Each check had printed on it, a P.O. Box address for the Township. The cover letter accompanying the check, addressed to the tax collector, had the Township's street address. The letter stated that the two checks were being sent in accordance with the enclosed tax bills, and noted, "[a]gain, please change the address for the property," including for "the future subdivision" to plaintiff. Mr. Glackin asserted that he alerted the tax collector the same day that he was mailing the check and she responded that she would expect it. A few days later, after receiving a paper copy of the tax bills, he claimed he called the tax collector to reiterate the fact of his payment of the tax bills. He was aware that interest generally accrued for late payments but since the payment was due, with the ten-day grace period, thus, November 10, 2015, he did not believe that an October 29, 2015 mailing would be untimely received.

---

[4] The October 2015 bank statement showed a draw of $514,273.38 being credited to plaintiff on October 29, 2015. The November 2015 bank statement showed an advance of $1,487,397.62 on November 25, 2015. The December statement (December 1, 2015 to December 31, 2015) did not reflect any advance or draw.

[5] The tax collector's email to plaintiff queried whether it "also" needed the "regular bill."

5

Although the checks showed a P.O. Box address for the Township, Mr. Glackin asserted that this was due to an automatic generation by Quickbooks software, and was not used to mail the checks. Rather, he claimed, he had written the Township's street address on the mailing envelope, which was not a window envelope showing the P.O. Box address on the check.[6] He stated that he had personally printed out the checks, placed them in the envelope, with the proper postage, hand-wrote the return address on the envelope, and handed it to the postal worker at the Neptune post office for mailing. He recalled having included this envelope with about 7 other checks for the fourth quarter 2015 taxes for several other properties, and had rubber-banded them together for delivery to the post office.[7] He stated that this was his usual practice (i.e., mailing all quarterly checks for taxes at the same time), even if they were for large amounts, through regular mail. When confronted with the contradiction in his deposition that he "did not actually put it in the mail," he stated that when he was perusing the documents in preparation for trial, specifically the bank statements, he recalled that he personally undertook the mailing of the tax payments because plaintiff was about to make a draw of its construction loan, and it had to be current on all taxes to be able to make such a draw. He stated that for every draw he had to affirm to the bank that all taxes were current. Since he had a tax draw on October 29, 2015, he had to ensure taxes were current, which is also why he called the Township for the tax bills. He stated that he never received any calls from the bank, or had any draw declined on grounds plaintiff owed taxes on the Subject.

---

[6] Plaintiff produced copies of checks for other months made payable to the Township, which showed the same P.O. Box number on the checks. All these checks were cashed. It also provided the bank statement for the period December 1, 2015 to December 31, 2015 to show that a check for $15,000 made payable to the Township, showing the same P.O. Box number of the check, was cashed.

[7] Plaintiff provided copies of 8 checks, dated October 29, 2015, issued to various municipalities towards the fourth quarter taxes on various properties, and bank statements showing they were all cashed. Included were proof of two electronic online payments, also made on October 29, 2015, to another taxing district for the fourth quarter taxes.

During his review of plaintiff's October 31, 2015 to November 30, 2015 bank statement (received during the first week of December), Mr. Glackin noticed that checks #1059 and #1060 were not cashed. All other checks in sequential order beginning with number 1057 were cashed except for checks 1059 and 1060.

Mr. Glackin claimed that he then contacted the tax collector (sometime in December), and inquired if everything was okay with plaintiff's taxes, or if there were any "issues" in this regard. In his deposition he conceded that this inquiry was raised incidentally, in the course of a conversation as to another inquiry as to remittance of the $15,000 check (see supra n.6), which was for an escrow of a land use development fee, thus, unrelated to the rollback or fourth quarter 2015 tax. He also agreed that he did not affirmatively inform the tax collector that checks 1059 and 1060 were not actually cashed. However, he stated that the checks need not be (and are not) immediately cashed, and his concern was only whether the Township received the checks, thus, his query as to no "issues" sufficed. He claimed that the tax collector responded that there were no issues, a contention the tax collector refutes.

It is undisputed that Mr. Glackin never received a delinquency notice that taxes were owed on the Subject. When asked during deposition as to why he would care about receiving such a notice if he was positive that he mailed the tax payments, Mr. Glackin responded that this was a routine procedure since in prior instances when plaintiff transferred properties, the new owners had missed timely tax payments possibly due to lack of address changes being made, therefore, he would proactively forward delinquent notices to limit such instances. He would do the same for notices of tax assessments since he was aware that challenges to assessments were time-sensitive.

Mr. Glackin stated that he became concerned when the December 2015 bank statement (received during the first week of January) also did not show the checks as being cashed. He

7

therefore sent an e-mail to the assessor and the tax collector on January 6, 2016, stating that "[o]n October 29th [plaintiff] paid Roll Back Taxes as per our discussion" per the e-mail chain attached, and had received the December bank statement which showed the "check is still outstanding." He claimed he also called the tax collector making the same inquiry to which she apparently responded that she had received the check.

However, the next day, the tax collector advised Mr. Glackin that she was mistaken because the checks were never received. She also notified plaintiff that because of this she would have to charge interest of $10,718.62 (for November 1, 2015 to January 7, 2016) as well as an "end of the year" penalty of $19,982.40, since taxes were unpaid as of December 31, 2015.

Mr. Glackin then immediately delivered duplicate checks for the rollback and the fourth quarter 2015 taxes, and one for the penalty and interest. He requested an abatement of the interest and penalty, but was advised this was not within either the assessor's or tax collector's authority. An internal memorandum documenting a telephonic conversation of January 7, 2016 between Mr. Glackin, the assessor, and the tax collector, reflects that Mr. Glackin called asking for a waiver of the interest and penalty since he was "never properly billed," to which the Township responded that it had "provided him all information necessary for [him] to make the necessary payment of taxes."[8] The memorandum notes that Mr. Glackin advised the Township that he knew the amount of tax payable, and its due date, and had "paid" the Township on October 29, 2015. The Township told him no payment was received, hence interest and penalties are due. The memorandum also notes that Mr. Glackin knew that "the check was still outstanding as of December 31, 2015." There

_____

[8] The memorandum notes that as of November 1, 2015 rollback tax amount of $323,520.71 was due, as was the tax of $561.73 "for normal QFarm taxes."

was no recitation to the effect that Mr. Glackin had stated that he had followed-up with the tax collector in regard to his payments of the tax.

Per the tax collector, when checks are received, they must be processed within 48 hours. She or her deputy would open the incoming mail, any checks received are placed by her or her assistant in a cash drawer, which is locked daily, and the key is kept in her desk drawer which is also locked daily. Checks when received, are collated, then electronically deposited. She claimed never to have lost or misplaced checks. Her normal procedure in responding to calls as to tax owed or status of a tax payment, is to first retrieve the property's information electronically, and read out the computer entries which show whether taxes were owed or paid. Additionally, such status is also accessible online on the Township's website. She followed this procedure in January 6, 2016 when, according to her, Mr. Glackin called her for the first time, and then e-mailed him the electronic statement of liabilities on January 7, 2016. The statement showed the prior owner as owner of the Subject, the total taxes "billed" for the fourth quarter of 2015 as $324,082.44, with interest of $10,626.68 and "other delinquent balances" as $19,982.40.

The tax collector maintained that she never received any checks from Mr. Glackin, nor the accompanying cover letter. She refuted Mr. Glackin's claims of having called her at any time for a follow-up to his alleged tax payments on October 29, 2015, or of her assurances that she had received the checks, or that there were no issues in this regard. However, when asked this question again vis-à-vis her deposition, she stated she could not recall if she spoke to Mr. Glackin in December of 2015. When deposed, she also stated that Mr. Glackin may have sent in the checks but they could be "[f]loating out there in no man's land like all the other mail." However, she was positive that she never received any checks until January 7, 2016 when Mr. Glackin delivered them. She stated that it was only sometime mid-or-late December, while reviewing the tax

9

collection rate, which was on the low side, did it strike her that the large rollback tax payment from the prior owner was overdue. She conceded that she had sent a delinquency notice sometime November 15, 2015 only to the prior owner for the rollback tax amount and the fourth quarter tax amount. She also stated (during deposition) that the Township has never waived interest and/or penalties, but denied ever having been dismissive of Mr. Glackin's request for abatement of penalty and interest by asking him to sell the lots for more.

**FINDINGS**

The only issue is whether plaintiff made a timely payment of the rollback and fourth quarter 2015 taxes, for purposes of the validity of the interest and penalty imposition. By statute, the failure to receive a bill for the rollback taxes, or even for a quarterly installment of a regular tax, is no excuse for its non-payment. Thus, although the statutory scheme[9] requires a tax collector to "at once begin the work of preparing, completing, mailing or otherwise delivering the tax bills" to the property owners "at least one week before November first," (see N.J.S.A. 54:4-63.19), and taxes are "payable on" November 1, (see N.J.S.A. 54:4-63.20),

> [t]he validity of any such tax or assessment <u>or the time at which it shall be payable</u> shall not be affected by the failure of a taxpayer to receive a tax bill, but every taxpayer, to whom a copy of any such judgment of a county board of taxation is sent, is put upon notice to ascertain from the proper official of the taxing district the amount which may be due for taxes upon the assessment of the omitted property according to such judgment.
>
> [N.J.S.A. 54:4-63.19 (emphasis added).]

---

[9] When a rollback tax assessment is imposed, the procedures for the "collection . . . and payment over of the roll-back taxes" are the same as for the "assessment and taxation of omitted property." N.J.S.A. 54:4-23.9. Under the omitted assessment procedure, a county board of taxation must send a copy of its judgment to the assessor and property owner, N.J.S.A. 54:4-63.14, after the assessor must prepare a tax list and duplicate, and file it with the county board of taxation reflecting inclusion of the omitted property. N.J.S.A. 54:4-63.17. The county board of taxation should then deliver a duplicate of that list (duly certified) to the tax collector. Ibid.

10

An identical caveat applies to taxes due on regular assessments, and paid quarterly, except that the taxpayer has to ascertain the "amount which may be due for taxes or assessments against him or his property." See N.J.S.A. 54:4-64(a)(3). In connection with the interest on the third installment of the current year taxes, the "tax bill shall contain a notice specifying the date on which interest may begin to accrue." N.J.S.A. 54:4-64(a)(4) (emphasis added).

If the tax remains unpaid after November 1 (the date it is payable), then it "shall become delinquent." N.J.S.A. 54:4-63.20. Interest and penalty can then apply. Although a property tax bill must include "on or with the tax bill the delinquent interest rate or rates to be charged and any end of year penalty that is authorized," N.J.S.A. 54:4-65, there is no requirement for a municipality to issue periodic notices of tax delinquencies.

Nor is there any statutory mandate for the imposition of interest and penalty. Rather, it is left to the discretion of a governing body of a municipality, subject to monetary limits. Thus, N.J.S.A. 54:4-67 provides that a "governing body may also fix the rate of interest to be charged for the nonpayment of taxes . . . on or before the date when they would become delinquent," and/or decide that no interest will be imposed "if payment . . . is made within" 10 days of the date the tax is "payable."[10] The interest rate "so fixed shall not exceed 8% per annum on the first $1,500.00 of the delinquency and 18% per annum on any amount in excess of $1,500.00." Ibid. The interest is computed from the date the tax was payable until the date it is paid. Ibid.

A "governing body may also fix a penalty" provided the delinquency exceeds $10,000, and provided further that the taxpayer "fails to pay that delinquency as billed, prior to the end of the fiscal year." Ibid. The amount of penalty cannot be more than 6% of the delinquent amount. Ibid.

---

[10] See also N.J.A.C. 5:33-1.6 which defines "current payment" of tax as one "which is not yet due and payable" or "which became due and payable within the tenth calendar day prior to its receipt, provided that the municipality has adopted a resolution allowing" a 10-day grace period pursuant to "N.J.S.A. 54:4-67."

The Legislature also granted a governing body the discretion to abate, revise, alter, adjust or settle delinquent tax, "and of any and all interest and penalties" as it deems "equitable and just and be for the best interests of the municipality." N.J.S.A. 54:4-99.[11]

Based on the facts here, the rollback taxes were due November 1 of 2015 since the County Board's judgment was issued prior to October 1, 2015.[12] The Township concedes that it provides its taxpayers a 10-day grace period to make payments without interest. Thus, plaintiff had until November 10, 2015 to pay the taxes (rollback and the fourth quarter 2015) to avoid interest and penalties. Plaintiff claims it paid the taxes well within the November 10, 2015 deadline, and it should not be blamed for the alleged loss of its mail, thus, imposition of the interest and penalty is improper. The Township maintains it never received payments, and plaintiff was obligated, once it knew that its checks were not cashed, to correct the non-payment, as opposed to allegedly calling the tax collector as a follow-up in the course of an inquiry as to a non-tax related payment.

N.J.S.A. 54:4-63.19 does not impose a duty upon a taxpayer to make inquiries of the assessor or the tax collector whether the payments made were cashed. The statute's caveat is that an excuse for non-payment or late payment cannot be the lack of receipt of a tax bill, since the taxpayer is obligated "to ascertain from the proper official of the taxing district the amount which may be due for taxes." Ibid. It is clear from the record that Mr. Glackin diligently ascertained the amounts due for the rollback and fourth quarter 2015 taxes from the assessor and the tax collector up until October 29, 2015. The Township sent Mr. Glackin duplicates of the tax bills only after he asked for the same, despite all of his prior communications specifically requesting all bills and

---

[11] A decision to abate the actual tax requires satisfaction of certain other conditions. See N.J.S.A. 54:4-100. Additionally, if the agreed to amount is not paid within 60 days of the agreement, then the governing body's decision to the abatement or revision becomes "null and void." N.J.S.A. 54:4-101.

[12] See N.J.S.A. 54:4-63.20. If the judgment is rendered after October 1, then the rollback taxes are due November 1 of the following tax year. Ibid.

notices be sent to him. Although the assessor and the tax collector could not electronically make an ownership change to its tax records, they were fully aware of such a change, and made manual notes of Mr. Glackin's requests, but never informed him that the inability to generate tax bills in the new owner's name rendered his requests futile. While these facts may be irrelevant because the Township e-mailed him the tax bills, albeit at Mr. Glackin's request, they are recited to show that plaintiff fully complied with the obligation cast by N.J.S.A. 54:4-63.19. Plaintiff was not obligated under this statute to further inquire as to whether the checks were actually received, and then ensure whether they were actually cashed by the Township.

The issue then is, whether, for purposes of imposition of the interest and penalty, plaintiff must ensure that payments were actually received and cashed by the Township, or whether it can rely upon the common law "mailbox rule" to prove its mailing by regular mail, which then raises the presumption of receipt. The court finds no reason why this common law rule cannot apply to the issue here. The tax statutes governing the payment and collection of local property taxes do not mandate the tax (whether they are the regular quarterly installments, or a one-time rollback tax) be paid by a delivery method that ensures actual receipt, such as by personal delivery or certified mail, return receipt requested. To the contrary, the regulations contemplate use of regular mail by providing that a taxpayer who requests a "receipt for payment sent through the mail," must include "the bill, stub, and a self-addressed stamped envelope for the return of the receipt." See N.J.A.C. 5:33-1.7.

Thus, and in the absence of any contrary statute or regulation, the court finds no reason to disallow applicability of the mailbox rule to prove tax payments. See e.g. Szczesny v. Vasquez, 71 N.J. Super. 347, 354 (App. Div. 1962) ("Absent . . . a legislative enactment or contract provision respecting the method of giving notice, the general rule is that there is a presumption that mail

13

matter correctly addressed, stamped and mailed was received by the party to whom it was addressed, which presumption is rebuttable and may be overcome by evidence that the notice was never in fact received"). See also J & J Realty Co. v. Township of Wayne, 22 N.J. Tax 157 (Tax 2005) (applying the mailbox rule in deciding whether the taxpayer's assertions of mailing a response to a municipality's request for financial information was presumed received, and rejecting the argument that mere assertions of a mailing, which was not received, will defeat the intent of the statute); Okosa v. Hall, 315 N.J. Super. 437, 441 (App. Div. 1998) ("by authorizing the use of mail as a means of paying premiums, the carrier constituted the postal authorities as its agent" therefore, the "Mailbox Rule" applies).

The common law mailbox rule is that mail which is "properly addressed, stamped and posted" is presumed to be "received by the party to whom it was addressed." SSI Medical Services, Inc. v. State, 146 N.J. 614, 621 (1996). The standard of proof is by a "preponderance" of the evidence, which includes testimony and objective corroborative evidence. Id. at 622-24.

Under the totality of the presented evidence, the court finds Glackin's testimony credible. As a person responsible for the timely payment of all taxes, not just for the Subject but for several unrelated properties he manages on behalf of the management company, and in this connection, ensuring that he establishes good public relations with the taxing personnel, he had to be, and was, diligent as to ensuring timely payment of taxes. This responsibility was also enhanced since the monthly construction loan advances could be jeopardized if taxes were delinquent. While it is true that on the date the checks were mailed, i.e., October 29, 2015, the draw was already credited, thus, the tax payments could not have impacted that advance, the next month's draw on November 25, 2015 would have been jeopardized at that point if the October 29, 2015 payments were deemed delinquent.

More to the point, the corroborative evidence of several checks to various taxing districts for the fourth quarter property taxes on the same day, all of which were cashed, allows the court to infer that Mr. Glackin would be no less diligent about mailing the rollback and fourth quarter property taxes to the Township on the same day. The court finds it would be incongruous to conclude that Mr. Glackin who was undisputedly diligent in (1) informing the assessor about the proposed purchase of the Subject, its future use for non-farmland purposes and its subjection to rollback taxes; (2) seeking information as to the projected rollback tax liability; (3) notifying the Township that he should receive all bills and notices from the assessor's or tax collector's office as to the Subject; (4) following up when the rollback and fourth quarter 2015 tax bills were not received by him, would decide not to pay such taxes, or somehow become careless about mailing the tax payments on or before November 10, 2015.

That Mr. Glackin should have ensured a personal delivery of so large an amount of the rollback tax because he knew far in advance of the amount payable and the due date, and further that interest would accrue for late payment, does not defeat the credible evidence that he mailed the payments before the 10-day grace period. While it may have been prudent to personally deliver the checks, there is no statutory requirement to do so, and given that he had until November 10, 2015 to make the payment, there was at least three days, if not more, for the mail to be timely delivered by the post office.

That Mr. Glackin should have used the word "cashed" as opposed to "issues" when he called the tax collector to be assured that plaintiff's taxes were paid, does not defeat the proof of mailing. Mr. Glackin is correct in his supposition that checks are not always immediately cashed, especially when he was unaware of the 48-hour check deposit strictures. Additionally, he was completely unaware that the Township never received the checks, was never sent a tax delinquency

15

notice, and indeed, even the tax collector noticed only towards the end of December 2015 that the large payment for the rollback was not received, and then only when she was examining why tax collections, in general, were on the low side.

That the Township's internal memorandum did not include any conversation of Mr. Glackin claiming to have made inquiries of the tax collector whether there were any issues as to plaintiff's taxes, does not debilitate his credibility. Understandably, Mr. Glackin was upset that he was never informed as to tax delinquencies despite being pro-active and diligent in volunteering for imposition of a rollback assessment, seeking out the tax bills, and specifically requesting tax bills and delinquencies be sent to his attention. Additionally, he was not posturing for purposes of future litigation, but attempting to amicably resolve the imposition of only the interest and penalty and seeking an abatement of the same.

The alleged discrepancies in Mr. Glackin's deposition testimony and trial testimony are not fatal. Although during trial he maintained that he had used a regular, as opposed to a window envelope to mail the payments, whereas during his deposition he stated he used a window envelope, the testimony was consistent both times that he did not use the P.O. Box address for mailing (as the street address on the cover letter showed through the window envelope).

Again, although in his deposition he stated that "I did not actually put the check in the mail," this testimony was in reference to the $15,000 check he sent to the Township for a land development escrow fee. When asked who transmitted the rollback and fourth quarter taxes checks, he said "I mailed them," and when asked "is that your role, or is that somebody else's role" he said "in this case I did this." Thus, there was no contradiction as to the mailing of the checks that would raise concerns as to his credibility.

The court does not find credible a position that Mr. Glackin, after diligently ensuring receipt of the tax bills, would have forgotten, or deliberately omitted to make those tax payments, and risked accrual of interest and late penalties by disregarding the November bank statement which showed the checks were not cashed, yet called promptly in January because the next month's statement also showed the checks were not cashed, and then immediately paid the taxes by personal delivery.

The tax collector's testimony to overcome the presumption of receipt, namely, her normal procedures when checks are received, their secured status until deposited, the 48-hour time frame within which she has to electronically deposit the checks, thus, has never lost or mislaid a check, is also credible. However, her belief that if the checks were mailed to a P.O. Box they would never have been delivered (as stated in her deposition) is belied by the cashed checks to that very P.O. Box address during October-November 2015. She was unsure whether or not Mr. Glackin called her as a follow up because she first vehemently denied it, then, claimed she was not sure. Similarly, in her deposition she denied he called her on January 6, 2016 (although she remembered him coming in), yet later when plaintiff's attorney asked if she remembered conversing with Mr. Glackin (who had called her from plaintiff's attorney's office), on January 6, 2016, she replied in the affirmative. Additionally, her testimony was that she was only expecting payments from the prior owner to whom she sent the tax bills and the delinquency notices, and only realized in mid-December, during the course of her review of annual tax collection rate, that the prior owner did not make payments. This was despite the fact that she had sent a delinquency notice in November to the prior owner for the large rollback tax amount

In sum, on a balance, and in light of the entire testimony, the court finds that the evidence as a whole tends to prove that Mr. Glackin mailed the tax payments, along with the cover letter,

and copies of the tax bills, when he delivered the same to the post office in a properly addressed envelope, with proper postage, and return address, in a rubber-banded group of other similar mailings. Therefore it finds that plaintiff's October 29, 2015 mailing to the Township was presumptively delivered, and the Township's evidence to rebut the receipt is not as persuasive. Consequently, the court deems the tax payments were timely made by plaintiff, which then means that there can be no interest and end-of-year penalty for late payments.

## CONCLUSION

For the above reasons, the court vacates the late payment interest and penalty imposed by the Township. An Order and Judgment in this regard will accompany this opinion. Refund of the $30,701.02 amount paid by plaintiff for the interest and penalty will be without any interest.

Very Truly Yours,

Mala Sundar, J.T.C.